Chief Judge Kaczynski, and may it please the Court, Kathleen Sullivan for Mattel. I'd like to talk about three issues today, just the statute of limitations, the Toy Fair trade secret damages calculation, and the attorney fees calculation. To begin with the statute of limitations, this entire Toy Fair trade secret trial, which resulted in $88.5 million, doubled $85 million after remitter, that whole trial should never have happened because MGA's Toy Fair trade secret counterclaim in reply was untimely. Now, this counterclaim in reply was not filed until August 16th of 2010. And it's plainly untimely under the relevant state statute of limitations, CTSA, which is a three-year statute of limitations with a discovery rule based on reason to suspect. It's plainly untimely unless it's a compulsory counterclaim in reply that relates back to Mattel's trade secret counterclaim filed January 12th, 2007. Now, why it's so important that it must be a compulsory counterclaim in reply is that MGA was plainly time-barred as of August 2010. Did they admit that? They make a, Judge Trout, what I think is a completely untenable argument. They don't quite admit it. They say, oh, well, we couldn't have found out really about these Toy Fair trade secrets until July of 2010 when we got discovery. When do you think they should have reasonably been unnoticed? At a minimum, Judge Wardlaw, in April or October 2004. And that was, what happened in that day? That's when Brower and Machado defects to MGA. And don't take it from me. Take it from MGA's pleading at ER 1132 and 1134 where they say. I want to ask you something about that, though. Didn't Brower and Machado have nondisclosure agreements when they left Mattel? Not to protect MGA's trade secrets. But to not disclose the activities of Mattel's marketing intelligence operations. Well, Your Honor, what MGA has pleaded is that they did know. And that knowledge is imputed to MGA. There's no doubt under Cypress Semiconductor that their knowledge is imputed to MGA. And what MGA has pleaded is that they knew about the Toy Fair in ER 1132 and 1134. It's MGA's own pleading. MGA is hoist on its own baton. They being the two people. The two Mattel defectors, Machado and Brower, who go over to MGA, are pleaded to have known about Toy Fair. Now, Judge Wardwell, if there's any doubt, I'd refer you also to ER 1086-90. You know, I'm just having a conceptual problem. Granted, they defected. And there seems to be a lot of defections going on here. But they defected. But they're under an agreement with Mattel not to disclose certain things that they learned while they were at Mattel to their new employer, right? But, Your Honor, MGA pleads that they knew that they were at their new employer. That knowledge is all that's needed to impute to MGA. So you're going under imputation. Imputation. But, Your Honor, it's more than that. The compulsory counterclaim rule here. Now, let's remember, this is an extreme exception. A counterclaim in reply is an exception. It's a very strange and exotic pleading. It's an exception to the usual rule that you have to amend your complaint. So MGA is coming in August of 2010. It hired these people away in 2004. It's writing detailed Toy Fair discovery requests as early as November 2006. So the idea, it's fanciful to think that MGA's own pleadings don't give a basis for you to say they had reason to suspect. And remember, Cypress Semiconductor, California law, is reason to suspect. They don't have to have gotten a discovery. Is imputation anything like a presumption? In other words, can you rebut imputation in any way? Your Honor, it's a matter of state law. It's a rebuttable presumption that there's nothing in the record to suggest that this knowledge should not be imputed to MGA. And through Isaac Larian, the joint CEO, it's imputed to all the MGA entities. But what I want to focus, Your Honors, on is Rule 13. We haven't gotten to this yet. It's the language of transaction and occurrence. Transaction or occurrence. Rule 13, which is the relevant rule, says that a counterclaim is compulsory only if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. So Judge Wardlaw, Rule 13 is really asking us not to look at knowledge. It's asking us to look at the pleadings. And the question is, are the pleadings about the same, this is your word, this Court's word, the same operative set of facts? And the pleadings are not. Mattel is suing MGA because these defecting employees allegedly stole trade secrets from Mattel's own computers and brought them to their new employer, MGA. MGA is pleading a very different set of operative facts. It's pleading that nefarious Mattel employees employing disguises and fake business cards infiltrated MGA's toy fairs and stole toy fair trade secrets. Those are two different sets of operative facts. Did Judge Carter ever grapple with the definition in Ray Pegasus that requires the same aggregate set of operative facts, or did he simply say these are logically related? He said they're logically related, Your Honor, and he said at the motion to dismiss stage. And I want to quote this to you. This is very important. I think this is a dispositive statement by Judge Carter at the motion to dismiss stage. So Judge Carter, even if he used the right standards, here's what he said. This is ER 236 to 237. He said, MGA does not expressly allege that Machado and or Brower brought market intelligence group information, that's the toy fair stuff, to MGA from Mattel. And once Judge Carter reached that, Your Honor, he should have been the end of it. We think he erred on the side of logical relationship. The test is operative facts. Pegasus gold couldn't be clearer. But he also made – once he made that finding as to the pleadings, that should have been dispositive. What he did, Your Honor, is he said, well, maybe discovery will show some kind of connection. Maybe Mattel's defecting employees stole MGA's own trade secrets and brought them to MGA, which is a sort of absurd proposition since MGA already had its own trade secrets. What I absorbed from his order was that he was applying the more liberal, flexible, logical connection test, and he thought it would be in the interest of judicial efficiency and, you know, not wasting resources to just tie this all together. Your Honor, we think he made two errors at the pleading stage. Number one, he didn't treat the – two legal errors at the pleading stage. You are both correct, Judge Trott and Judge Wardlaw, that he applied too liberal a logical relationship standard. This Court is clear. Logical relationship – I didn't say it was too liberal. I'm asking you about it because, you know, the Lazar case kind of in the bankruptcy context applied that kind of a role. Logical relationship is defined in Lazar, quoting Kingstaff, as – here's the definition of logical relationship restated in Pegasus Gold – is a claim arises from the same aggregate set of operative facts as the initial claim. That is the definition of logical relationship. A logical relationship exists only with the same set of operative facts. If you don't have the same set of operative facts, you don't have a logical relationship. Well, that the same operative facts serves as the basis of both claims. That's it. Or the aggregate core of facts upon which the claim rests activates additional legal rights or otherwise dormant in the defendant. And, Your Honor – And I keep talking about facts, facts, facts. It seems to me that Judge Carter may have been driven by the idea that he didn't want to have two trials. But that – But one trial is out if the statute is run. Am I right? The statute runs. The second trial would have – the second trial never should have happened. The Toy Fair claims never should have been tried. And I want to address this point about case management and judicial economy. Let's go back and remember case management and judicial economy. That might pertain if we were talking about the world of permissive counterclaims. We have permissive counterclaims for judicial economy. Compulsory counterclaims are not about judicial economy. And the only way – remember, this is an exotic pleading. They're time-barred from amending their original complaint. So the only way they get relation back is a compulsory counterclaim in reply. It has to be compulsory. It can't be permissive. And case management is never a reason to find a claim – a counterclaim compulsory. Let me give you a simple illustration, Your Honor. Suppose we had tried our case separately. Suppose McHale came in and just tried its own trade secret theft claims separately. And there was a judgment. Could have been for us, could have been against us. And we could have won, yes, Machado and Brower stole your trade secrets from your computers. Or it could have been against us. No, they didn't. Now suppose MGA came along and had a timely – a timely claim that McHale stole trade secrets from its toy fair. MGA's argument is they would have been precluded. That those are so much the same transaction or occurrence that they would have had to forfeit their counterclaim if they hadn't brought it as a counter – sorry, forfeit their new claim if they hadn't brought it as a counterclaim. That's the – I mean, if you read Wright and Miller, there's four different standards that seem to be in play, and that's kind of the res judicata standard. That is, Your Honor. It's your – it's this Court's standard, in your opinion, in Mitchell v. C.B. Richard Ellis, 611-F3-1192, where you restated that. You said where a claim was compulsory, where a counterclaim was compulsory at the time the earlier claim was brought, it's forfeited at a future time. It can't be brought. It's precluded. And here what – the logic of Judge Carter's argument and MGA's argument is if we had a separate judgment on our trade secret claims, if it's the same transaction or occurrence through this loose logical relationship test, they wouldn't have brought it. I think you would have thrown us out. I think if McHale came forward and said they are precluded because they didn't bring toy fair claims having nothing to do with McHale computers as a counterclaim to our claim about theft from a computer by different actors at a different time and a different relationship, there's no way you would have found that claim precluded, and therefore there's no way that you can find this counterclaim in reply. Lurking under all of this is a dispute about the standard of review that we're dealing with. Absolutely, DeNovo. You say DeNovo, and the other side says absolutely abusive discretion. In your reply brief, you've been very – you won't say anything else in addition to your reply brief? Well, Your Honor, I just go back to Pegasus. I mean, Pegasus goals questions of subject matter jurisdiction are reviewed DeNovo. It's a subject matter jurisdiction question. It's about the pleadings under Rule 13. You're in the exact same position as Judge Carter is to look at the pleadings. And again, I asked you to think about it in my preclusion hypo. What if it were the other way around? They're coming in and saying toy fairs. We want to make a toy fair claim. Would it be precluded? Your Honor, I'm running out of time for the other issues. I have a couple of questions. One of them is you mentioned ER 1086 to 1090 a couple of times, but you didn't get a chance to point to what it is there that you found relevant. I'm sorry. Chief Judge Kosinski, which page? It was – I think it was ER 1087 to 1089. Okay. It looks like a request for admissions, perhaps. Right, Your Honor. It's a discovery request. And what I call to your attention there, the 1086 to 1090 is MGA's discovery request to Mattel. But the reason we cite it to you is that it's a pre-August 2007 indication that they had reason to suspect the toy fair conduct. And the reason I call it to your attention is it's extremely detailed. It talks about planograms and the layout of toy fairs. And the reason we cite it is that if MGA had enough knowledge of toy fair to make that discovery request, if it's counsel speaking for the corporation judge, that's additional reason. But what I'd like you – That's why I didn't reach my second question. Why isn't that the jury question, whether they satisfy the discovery rule? Why isn't that a jury question? Your Honor, if Judge Carter had thought there were issues of fact as to their knowledge, he could have put that to the jury. Obviously, you can do statute of limitations, factual questions before a jury. But he erred legally by taking the whole question under the wrong standard. He said logical relationship was not operative. Well, let's say we accept that argument. Why don't they – I mean, the statute of limitations is the statute of limitations. You go back, what, three years in California, whatever the statute is, but then there is a discovery rule. That's right. And you can say, well, but we didn't have a reasonable chance to discover until, you know, some point, you know, within the statute of limitations or within the time. And isn't that the kind of thing that gets decided by a jury? Well, we think not, Your Honor, because the pleadings here, it would if the pleadings were ambiguous, but the pleadings are not. You're saying that there's simply no genuine issue of material fact. That's exactly right. Did you ask that it go to a jury? We didn't ask that it went to a jury, no. And, Your Honor, it's not 1086 that's the most important side. It's ER 1132 and ER 1134. That's MGA's own compulsory counterclaim in reply filed on August 2010. It's a hoist on their own petard problem. They can't plead that Brower and Machado knew about the toy fair. They can't plead that and then say, oh, we had no reason to suspect toy fair. That's unacceptable. And, Your Honor, Rule 13 refers to at the time of service. It's a rule about what you knew at the time of service. You can't amend a compulsory counterclaim in reply. You've got to get it right and have it relate back as a compulsory counterclaim to the pleading it's responding to. Excuse me, Judge. So you're relying on the pleadings. I'm just wondering if there's any evidence in the record that Machado and Brower informed anybody at MGA. And that's the amazing thing, Your Honor. There's no evidence to suggest that there was factual overlap. Remember, the key is, remember, it's not who knew what. What we have to prove, what MGA would have to have proved in evidence to make this a compulsory counterclaim would have been that the operative facts of the toy fair, alleged toy fair trade secret theft were the same operative facts as the alleged Machado defecting employee trade secret theft. And Judge Carter surmised, Judge Carter, you asked what did he do at the motion to dismiss stage. He said, well, maybe discovery will prove some connection. And the answer is, it definitely did not. When he got to the summary judgment, he said, oh, well, there's no proof of that, but you should have raised that at the pleading stage, which was a real catch-22, because, of course, Natel did raise that at the pleading stage. And we said the pleadings should make this a self-contained, the pleadings are their own refutation of the compulsory nature of this counterclaim. It must be compulsory. And Judge Wardlaw, I just want to emphasize, both Judge Wardlaw and Judge Trott, you asked about case management. Compulsory counterclaims in reply are not subject to judicial autonomy or case management rationale. They're about reviving a stale claim that was dead, so dead you couldn't amend your pleadings. And they're about a party's substantive rights. Here are rights not to be subjected to a new toy fair trade secret trial pleaded in 2010, where the very people you hired away who were the alleged malefactors were hired away in 2004. It's ludicrous. And the entire trial should have been rejected as time war. You would have to depart from the compulsory counterclaims in any other way. Let's say, as a matter of discussion, we don't buy the imputed argument. What's your fallback from there to show that they were on notice or should have been on notice outside of the three years? Your Honor, we think that California law, which is the governing law here in the world of URI, requires you to impute because Cypress Semiconductor. I'm asking what happens if we don't buy that. Absolutely. If you want to reject that, Your Honor, that's why I cited you to the passage Chief Judge Kaczynski asked about at 1086. That's MGA's counsel writing you a toy fair monologue. What's the date of that? Sorry? What's the date of that? That's November 2006. There's an additional one on August 3, 2007. August 3. Which precedes August 16. Okay. So that one, the reason I gave you that. That was the one date that I wasn't aware of. I saw the August 16, but then it's referred to as August, and I was wondering what day it was. That's okay, Your Honor. I'm happy to get you that cite if you like. That's okay. I'll find it. But November 2006, the request in November 2006 and August 3, 2007 are alike. And the key reason I cited them to you is they're so detailed. And if you don't want to impute Machado and Brower's knowledge to the company, if you think maybe they were bound by their Mattel obligation, you certainly must impute MGA's own counsel's inquiry. And I know that MGA will say, well, we couldn't get discovery until July 10th, July 2010. And Judge Kotka, they don't concede it. The answer is they don't concede it. They have what I think is a very feeble argument. Oh, we didn't know for sure until July 2010 when Mattel responded to some discovery requests. But that's not the case. That's why I'm flied and deceived and covered up. Well, I'm sure we'll hear a lot about it. Thank you, Your Honor, from MGA. I've read a lot about it already. This is a very important pleading case that is subject to your de novo review. It's about Rule 13. It's about counterclaims in reply. They are not a world for permissive counterclaims. They are not a world about case management or judicial economy. They're about our substantive rights. We should not have been subject as a matter of subject matter jurisdiction to this case. Let me make sure I understand. Let's say we buy your argument about the compulsory counterclaim. I'm not saying we will, but just. We would be very gratified, Your Honor. Maybe not. We don't know what follows next. All right. But I just want to get us on that page just so I can sink my way through it. Does that get you home free, or are you still subject to a claim on their part? I was posing the same question, as you can imagine. They say, well, you were subject to discovery. Never mind the compulsory counterclaim. And it should have been discovered long before. When do you say the discovery will come into play? Your Honor, we believe not. We believe that there is no, as Scott said earlier, there is no material difference of relevant facts. Their own claimings should be dispositive of the counterclaim. It's really a slightly different question. Was that presented to the district court, just a plain discovery rule claim? Was that presented to the district court? Is it before us? Is it in the case? Or is the compulsory counterclaim the beginning? As I understand, it was raised before the district court. There were alternative claims. The district court bought the compulsory counterclaim. It did not rule on the discovery rule. Your Honor, what the district court did is the district court allowed the counterclaim in reply to go forward in either of two alternative ways. He said, I'm not dismissing it. He rejected as a matter of law our motion to dismiss. That should have been granted. You should reverse. It's de novo. And the case should be over. And you should order it dismissed. His alternative was, well, you can go back and amend, you, MGA, can go back and amend your pleading, your complaint against Mattel, which was filed on April 13, 2005. Now, you notice they didn't do that. Why didn't they do that? Because they passed. They're time barred. They're time barred because April 13, 2005 is after they've hired Mattel and Brower away. So they can't go back and amend their complaint. I'm concerned about your imputation argument because I think there's a footnote in MGA's brief that talks about how that knowledge is only imputed if they gain the knowledge at the time when they're an employee. And they cite that as an alternative basis for an argument. And, Your Honor, in our reply brief, we cited you the California law that says that's incorrect. But actually, California law, which governs the imputation question, holds imputed to the corporation knowledge held by the employee whenever it was acquired, whensoever it was acquired. So the fact that the knowledge was acquired while they were at Mattel is irrelevant. Their knowledge, once they hold it, now that they're at MGA, is imputed to MGA. So, with respect, we don't think there's anything Chief Judge Cosentino can send back. The error was legal. It's reviewable on the pleadings. It's an extraordinary situation where MGA pleaded itself into a pleading cul-de-sac that it can't get out of. It's pleaded the very knowledge of its own employees, which is imputed to MGA. If you don't believe that, take their counsel in November 2006 when they filed the discovery request. And at that point, the compulsory counterclaim and reply is done. Now, Your Honor, if you send it back, you notice they didn't amend their original April 2005 complaint. They can't. That's time barred. So if you were to let this trade secret trial surmount Rule 13, it would be the first time ever that a stale claim, dead in the water, can't even amend your original complaint to plead facts to bring it back to life, is revived as a compulsory counterclaim and reply where it involves two totally separate sets of facts. And I just ask you to think about my hypo. If we won on our trade secret claims, would you really preclude them from coming in and say, hello, we've got this totally different story to tell you about toy fare theft. It's a great story. And you would say, you wouldn't say to them, well, you forfeited that by not pleading it as a counterclaim. You would say, it sounds like a good story. It sounds totally new. And that's the case. The opposite. This is a matter of real world reality. If they knew about it, set aside the should have known, if they actually knew about it, in this case, Gers went to trial, what would be their incentive not to file the counterclaim? They should have amended their pleadings, Your Honor. Or amended their pleadings. If they actually knew about it, not should have known, but if they actually knew, why wouldn't they? That's war law. I've asked myself the same question. When counsel or a party fits on its rights and doesn't do what it could have done in a timely fashion, you should not bend over backwards to find some novel first-time theory to save them from that strategic choice. I have no idea why they didn't plead it. And again, it's not should have known. It's reason to suspect. It's a very low bar in California. Reason to suspect. And if you don't think their own pleadings and their own discovery request evinces reason to suspect, that's why there's no facts, Your Honor. This is not a case where we have to look for the red flags and we have to find out what employees knew what and do the kind of thing you do before a jury. You can do this within the four corners of the pleadings in this case. Your Honor, do you want to hear anything about trade secret damages? You should probably. How about rebuttal? Well, if I could speak to damages and rebuttal, I'd be very grateful. We thank you. Well, probably if you're going to speak to it, you probably should speak now, because otherwise the other side doesn't get a chance to respond. Thank you for giving me extra time. I'm very grateful. I just wanted to be sure we handled statute of limitations. We assume this case will go over. Thank you, Your Honor. I want to focus on damages. We've made arguments. It's laid out in detail at pages 16 to 18 of our brief, why we think trade secret liability has insufficient evidence. But I want to focus here on damages. And the key is that if you go to the verdict form, the jury found not one lump sum form of damages. It didn't find lump sum, $88.5 million of damages or lump sum 85. At the beginning of ER 268, you see a verdict form that was particularized product by product at MGA's request, MGA trade secret by MGA trade secret. I thought it was a pretty good verdict form. The way it had every single question answered, every single aspect of what a trade secret would be. It's very particular to court law, and that's why this court's decision in first alliance, which is the most important case for purposes of looking at this verdict form, gives you such a great basis to enter judgment for Mattel in whole or in part. Because this is the jury form in which the jury has calculated an average trade secret by trade secret damages amount of $3.4 million to the dollar, to quote in Ray first alliance. And there is no other plausible explanation for where they got that number, other than they took $3.4 million from MGA's own damages expert Malachowski's testimony. He said, well, some trade secrets on his list of 26 average out to 3.4. Now, here is in first alliance, that average is based on improper legal reasoning. It's an improper theory of damages. And why is that? Because Malachowski never testified to $3.4 million for each trade secret the jury found. The jury found 26 trade secrets. It turned out two of them were the same, so it's reduced to 25, so I'll refer to them as 25. The jury found 25 trade secrets. Eleven of them were not on Malachowski's list. Now, remember, what Malachowski is doing is calculating unjust enrichment as so-called head start damages. But the only theory he presents is infringer's profits. There's no lost profits theory. And he says, Mattel's profits are $3.4 million per trade secret. He never said that, by the way. He said, Malachowski gave testimony about only two trade secrets, winter wonderland and brass diamonds. There's not a single other product on this list that he testified about. He waved his hands at a chart, a very detailed chart. And did that chart have $3.4 million per trade secret? It wasn't admitted into evidence. It was a demonstrative. No, it didn't. It had very different trade secret numbers running between $20,000 and $16.4 million. And he said, and I quote, this is NGA's own expert, my bottom-up analysis is very stat-specific and can only be done on a product-by-product basis. That's ER 641 and 643. And when the jury found 11 products that weren't on his list, they were doing exactly what this court has cautioned against. They were penalizing Mattel for legitimate competition. If Malachowski has not calculated $3.4 million for 11 of these products, in fact, he hasn't calculated any head start damages for 11 of those products, the jury has penalized Mattel to the tune of $3.4 million per trade secret for perfectly lawful competition. There was no other basis in evidence. Now, so he only testified to two, the evidence that most supports two, and he didn't testify as to 11 of these trade secrets the jury concluded. There's no dispute that 11 of the jury's secrets, it may have tried to recreate the chart, but it missed. It threw the darts and it hit the wrong dots. So what was the improper theory of law that the jury followed? Well, we don't think the jury didn't. It was a pure infringer's profits theory, but it was infringer's profits without legal support of unjust enrichment from a head start advantage. And so now it can't be salvaged with another theory, and this is a case in which Judge Carter, who was reversed in First Alliance, does here exactly what was reversed in First Alliance, and that is to quote this court, bends over backwards to try to find a potentially valid basis in the record for the jury verdict. So you'll recall, I won't belabor all of them, but he says, well, maybe it was lost profits. Kalki lost profits. Malachowski never testified to any lost profits, and there was no lay testimony about lost profits. In a desperate effort to try to find some, MGA points to SER 198 and it says, well, the CEO of MGA, Isaac Larian, said, we lost sales, profits, and shelf space. Well, that is not a quantifiable theory of lost profits. And the other thing that the district court said, I'll just cite two of them, and he says, well, maybe top-down damages could salvage the verdict. Remember, Malachowski has another theory. He calls it top-down. He says that's an aggregate amount that Mattel profited in some inchoate way from having some kind of unstated advantage other than head start, product by product. Well, that can't work. First of all, Malachowski himself said that top-down, which he said, maybe there's $149 to $202 million of top-down damages. Malachowski, MGA's expert himself, said, ER 630, that my top-down analysis does not work unless all 114 claimed trade secrets are found to have been both protectable trade secrets and misappropriated. It's done. Top-down is done. And MGA admits it. In further excerpts of record, page 50, our further excerpts of record, page 50, MGA admits that the jury didn't follow top-down. But think about how ludicrous it would have been if they did. 114 trade secrets at $3.4 million a pop gets you to $387.6 million, which is double Malachowski's highest top-down number of 202 almost. I'd like to take you back a couple of minutes and ask you a question. You obviously know the record better than I do, and I hope I know the record as well as you do by the time I have to decide the case. But you keep talking about the November 2006 discovery request. That's what put them on notice outside the three-year window. What are you referring to? The business where they say access or attempts to gain access to MGA showrooms, planograms, merchandising displays, toy fair displays, false pretenses, including but not limited to using fake business cards? Because that's in August 2007. Your Honor, you're reading from August 2007 or from 1086? I'm reading from your brief. Where is the November 2006 discovery request? Is that the same thing that you're referring to? Because I couldn't find that, the November 2006 thing in your brief, so maybe I missed it. Okay, so, Your Honor, let me refer you to ER 1093. This is the August 2007 one. The one I referred you to before begins at 1086. Yeah, okay, that's the August 2007 one. That's why I'm having trouble finding the November 2006 one. Because you don't talk about that in your briefs. At least I can't find it. So, Your Honor, if I could refer you to ER 1088. ER 1088, okay. Is that referenced in your briefs? I couldn't find it. Yes, it is, Your Honor. Where? So that's MGA's first set of requests for production of documents. That's right. And, for example, Your Honor, on ER 1088, request number 31, that's a Joint Fair discovery request. And that's from the November, I believe, if I'm correct, that's from the November 2006 request. But, Your Honor, we rest first on the pleadings. The key about those two requests, Your Honor, those discovery requests, is that they evince the same reasons as the specs. They're just reinforcement of the pleading.  And you could decide the case without reaching them just based on the pleadings. Just by reading the pleadings. Thank you. Your Honor, just to summarize, you've given me a lot of time just to summarize. We think First Alliance requires you to revet the documents. I'm not sure of your summary, but we'll give you a little time. Thank you, Your Honor. You have more than double the time. Okay, we'll hear from MGA. May it please the Court, I'm Clifford Sloan for the MGA Appellees. And I'd like to address first the arguments about the compulsory counterclaim. And Ms. Sullivan has talked a lot about the timeliness issue. And I want to briefly address that. But then I want to get right to this question about whether it was a compulsory counterclaim. Because we believe that it clearly is a compulsory counterclaim that Judge Carter was correct under either a de novo standard or an abusive discretion standard. And the timeliness issue is a bit of a distraction because you don't even get to that unless you find that it was not a compulsory counterclaim. And I think in part Mattel is trying to sort of color the compulsory counterclaim analysis. But it is doing so in a way that omits very important facts in the record. And one thing that bears very heavily on this whole question of timeliness and discovery, which is completely overlooked by Mattel's presentation, is that there was a decisive event here, which is that in the summer of 2010, finally the whole structure of lies collapsed. And they talked about discovery requests. Mattel executives had been lying, lying, lying in depositions. And finally, in July 2010, they broke through. And that was the first time that MGA had knowledge about this whole market intelligence group and the how-to-steal manual. They were lying about their lies. They had a whole department devoted to lies, and they were lying about it. But how do we know that? What does that have to do with compulsory counterclaims? Your Honor, she's talking about... What does that have to do with compulsory counterclaims was the question. It relates to the timeliness issue. I'm happy to go right to compulsory counterclaims. That's where you said you wanted to go. That's where you said you were going. When you talk about timeliness, we're going to talk about compulsory counterclaim. You said you were going to talk about compulsory counterclaim. If you want to talk about that, talk about that. Okay. I was just trying to briefly address the question on timeliness and... You make up your mind. Which one do you want to talk about? Okay. But telling us you're going to talk about one thing and then talk about something else is only going to confuse us, and that doesn't advance your argument. So just tell us what you're going to talk about. You want to talk about timeliness? Let's talk about timeliness. You want to talk about compulsory counterclaim? Let's talk about that. Okay. Which one? Can I say one more sentence about timeliness, and then I'll... You want to shoot yourself right in the foot? Tell me which one you want to talk about. Let me go to compulsory counterclaim here. Okay. Talk about that. Okay. All right. Yes. Listen to the questions. It'll help us understand your answers. Thank you, Your Honor. With regard to the question of compulsory counterclaim, two fundamental facts are important here. First, Mattel's pleading in its counterclaim, in its broadly worded, sprawling counterclaim, it includes allegations that two Mattel executives, Machado and Brower, when they left Mattel, they took every internal document they could get their hands on, internal strategy documents, internal sales documents, internal marketing documents, and they took that with them to MGA. Second, MGA's counterclaim in reply alleges that Mattel's internal documents, its internal strategy documents, internal sales documents, internal marketing documents, includes trade secrets stolen from MGA and other competitors, and that Machado and Brower specifically had access to those, had received them. We're talking about the same category of documents here. Well, that's not the issue. The question is claim, not documents. You know, documents can support vastly different claims. The same documents can support a tort claim and a contracts claim. You know, just in plain English, just in regular English, what does this counterclaim have to do with the original claim? I don't see how it's compulsory or how they're any way related. Well, it has a logical relationship. Well, see, that's the problem. You parrot that, and so did Judge Carter, but there's a definition of logical relationship, and that's what Pegasus says, and you elide that in your brief, and you know what it is. You've read it. It says a logical relationship exists, and then it talks about this constellation or aggregate set of operative facts, and I'm having trouble finding that in this case because it's like chalk and cheese. It's the same kind of problem, but one is chalk and one is cheese. What's the nucleus? What's the constellation of operative facts that lies at the middle of these two things that make this a compulsory counterclaim? Well, because, Your Honor, in the same aggregate set of operative facts, there is this logical relationship. Let me give you an example by way of comparison. In the Supreme Court case in Moore v. New York Cotton Exchange, which is the fountainhead of this whole area of the law, the claim was by cotton brokers that there was an antitrust violation by the Cotton Exchange in not giving them certain bids and quotes from the Cotton Exchange. The counterclaim was that they were purlining the bids in any case, and so there you don't have the same claim, and the Supreme Court there says... It's the same facts. That is the same facts. What are the other... I asked you this question, and instead of answering the question, you said, let me give you an analogy. The question is which facts. Now, I don't want to hear anything else from you right now. I want to hear facts. Which facts are the common facts here that makes it compulsory? I don't want an analogy. Just which facts. The common facts are that the same documents are at issue. Those are not facts. Those are evidence. Documents are evidence. What are the facts in the real world? What are the facts that are in common? The facts are that there's the allegation that if... Let's assume the pleadings are correct, and Brower and Machado took with them from Mattel certain documents that had in them NGA's trade secrets. Mattel is claiming those are our trade secrets. That's what they're alleging, and I can point you to particular paragraphs if you like. And NGA, in reply, in the counterclaim in reply, is saying, you know, those documents, those internal documents which are trade secrets, not only are they not your trade secrets, but they're actually evidence of the trade secret misappropriation because they are trade secrets. They're conflicting claims over the same category of documents, which Brower and Machado... So the claim was that these documents were somehow stolen? Yeah. Mattel stole these documents from NGA? That Mattel stole secrets and put them in these documents. Why are you talking about documents? Because... Why am I talking about documents? Because that is... The allegations are that the trade secrets were embodied in documents, and they went from Mattel to NGA. And with Brower... Give me one such secret. Just give me one example. The thing that started out with NGA and then wound up with Mattel. Give just one fact or one secret. Okay. So let's say there was a... Let's say... How about use the diamond, the bling, the bling X, Diamond X? Oh, okay, yes. That's what he wants to know. He wants to know the story of what happened and why... So he can judge whether it's the same, you know, common... the same transaction or occurrence... Everyone knows me so well. So that's exactly right. Okay. So NGA was coming out with a new dial with a real diamond in it, okay? And Mattel gained access under false pretenses with this market intelligence group and got that information, and then Mattel quickly adjusted an existing product to put a real jewel there. So it stole the trade secret and put it there, okay? So the kind of allegation that's at issue here is that... I'm sorry. I'm sorry. You didn't complete the thought. Okay. So that sets up your claim. That's your claim. Yes. Okay. And how does that figure in their claim to make it compulsory? Right. Okay. So if... No ifs. No ifs. I think what he's saying... Can I just... Tell me if this is what you're saying. I'm not going to say I'm going to agree with you or not, but I want to know if this is what you're saying. You're saying that MGM, their counterclaim, said that MGA, when Brewer and Machado defected, MGA received trade secrets that belonged to Mattel. And your claim is that no. Some of what MGA received was MGA's own trade secrets, and that's what forms the basis of your claim against Mattel. That's exactly right, Your Honor. Is that what you're trying to say? Yes, Your Honor, because it was woven into Mattel's analysis of strategy and competition and so on. So that's exactly right. So when did Mattel file this counterclaim? Regarding Mattel. Well, Mattel first filed the counterclaim in January 2007, Your Honor. And this was the fourth amended answer and counterclaim, which was filed a few months before this was filed in August 2010. And so, again, there's a clear overlap of the documents that are at issue. You know, I still haven't given an answer to my question. You gave me an example. You started out by giving me an example of the diamond doll, the doll with the diamond, okay? And you said they took it and they changed one of their dolls to put a real gem in it. Yes. That's as far as I got. And rushed it out to market. Okay. And how did that figure in their claim against MGA? How does that? Because using this as an example, and I'm not saying the proof supports this, but using this as an example at the pleading stage, if Mattel in its documents. Not if. I'm asking how did it actually operate. You were going to give me an example from the record, a real example, and we've got you down to an example. Okay. So you now said this is something that they stole from you. Now, in order to make it compulsory, you're going to have to show me. And this is their claim against us also figured this. I'm not going to put words in your mouth because I don't know what you're going to say. But how does the second half of this operate? Well, with regard to these pleadings, Your Honor, this is not an example based on the documents with Brower and Machado. It's an example of the trade secret misappropriation. I mean, perhaps it would help if I quoted from the pleadings itself. I don't know. Since I don't know what you're going to say, I can't help you. I can't help you. Okay. Your Honor, Mattel. So in paragraph 45, page 1200, of the excerpts of records, Mattel says. Okay. What document is that? That's a complaint? That is Mattel's fourth amended answer in counterclaim. So this is Mattel's plea. Okay. Paragraph what? Okay. And so paragraph 45, page 1200. Okay. Okay. So among other things, Mattel says that MGA worked with Machado and others to steal as much Mattel confidential and proprietary information as they could access and bring with them to MGA. Okay. And so that's a general, very broadly worded statement. By the way, one thing Judge Carter pointed out is that because they worded it so broadly, they opened the door, because this is a very sweeping allegation here, as much confidential and proprietary information as they could access. Okay. Another example is in paragraph 36 of the same pleading. Is there any case that talks about opening the door, cutting right through the compulsory counterclaim law? You opened the door so we don't care about the rest of it. No. But, Your Honor, when you're looking at the same aggregate set of operative facts, as Your Honor has pointed out, it means that that playing field of the aggregate set of operative facts is much broader and larger because it's such a broad allegation. I don't see where this helps you, Your Honor. This says they stole from us. Okay. What does that have to do with you stealing from them? I mean, you could steal from me and I could steal from you, and the two have no necessary relationship. Two different burglaries. Yeah. Or, you know, I committed a burglary against your house and you do an embezzlement against my bank account. They're two thefts, but they have nothing in common.  Yes, but that's not this case, Your Honor. Well, show me how this case is different. Okay. So there are two parts to it. So the first part is what's in Mattel's pleading. So now let's look at what's in MGA's pleading. So we've established that Mattel, in their pleading, said that Mattel took as much confidential and proprietary information as he could take. Okay? Right. So now let's look at MGA's pleading, and let's look at paragraph 14 on page 1132. There are a few paragraphs that bear on this, but let's look at paragraph 14 on page 1132. Okay, hold on. Let me just get to 1132. I'm almost there. Okay. 1132. I'm right there. Okay. And there are a few things in this paragraph. Okay? So first of all... So is this paragraph 14 or 15? 14. Okay. And it talks about that there were presentations of hundreds of pages to be copied and distributed within the company on a worldwide basis. It says at least one of the recipients was Machado, and then it says, Mattel's market intelligence group tailored the information, assembling design information for the design group and marketing information for the marketing group. So what they're saying is that they were taking these trade secrets that they had stolen. This is what MGA is alleging, that Mattel was taking the trade secrets that they stole from MGA, and they were weaving them into documents that were going throughout the company, including to Machado. So the trade secrets were woven into those documents. And then in paragraph 10, page 1130, MGA says that Mattel adjusted its own product pricing and advertising plans to reflect these trade secrets. So again, a fair reading of this pleading is that the product pricing and advertising plans that Mattel had and that Machado and Brouwer had access to incorporated MGA's trade secrets. So you're looking at – so based on this pleading, let's talk about a particular advertising plan that has MGA's trade secrets in it. How's it compulsory? I'm still not getting it. Because MGA is saying that document is our trade secret. Okay, let's just look at this one document. And MGA is saying, no, not only is that not your trade secret, it's actually our trade secret because of the information that's in it. They're disputing over the same document. And this plays out. They're disputing over the evidence and the facts in the same document, the secret that's contained in the document. Well, the question is whose trade secret is it. Right, that's what you're saying. Yes, exactly, Your Honor. That's right. I think I'm saying it fair enough. So this is going to be found in each of the documents. Let's say we don't buy that. Where are you? Okay. Then we're at the timeliness issue, Your Honor. Okay. With regard to the timeliness issue, there's a very important fact, which is that in the summer of 2010, Mattel, for the first time, broke through the tissue of lies came down, and they admitted to the conduct for the first time. And so that would be fraudulent concealment. It would hold a statute. And, indeed, there's a very clear record here because the judge – I don't understand what you mean by tissue of lies. Okay. Well, let me quote from Judge Carter's laches opinion. Because Mattel – what I mean is that Mattel executives – What actually happened? Mattel executives lied in the deposition, denying knowledge of the market intelligence group. When were the depositions? What's the date of the depositions? I don't have the date of the depositions, but I do have Judge Carter's – 1850 and 19 – I mean, when were the depositions? Were they before or after November 6th or August 7th? Well, let me read to you exactly what Judge Carter said. You can't tell me when the depositions were taken? He's talking about depositions. I'd like to know when the dates were of the depositions. Wait, you've got a Sherpa coming up to you here. Yeah, they were in 2009 and 2010. So that's after the November discovery request and the August – okay. So it's after. And Judge Carter specifically found that the first Mattel – and this is at ER 745 – the first Mattel employee to publicly admit to the misconduct did so in a July 2010 deposition. And then he says numerous Mattel executives, including executives that had actual knowledge of the misconduct, denied the misconduct when questioned at depositions earlier in the period. Yeah, but doesn't that beg the question, you know, what did you know in November 2006? It seems like you had reason to know exactly what was going on. You were talking about phony IDs and all this stuff. No, Your Honor. I mean, it's one thing to maybe have, you know, an inkling in trying to get information because it's in the record of testimony from Mr. Leary. It looks like you had more than an inkling. Let me get this straight. Your Honor, isn't it either you're within the statute of limitations or you can present facts that some prior effect, which is not us, can decide to put you within the statute of limitations under the discovery rule because you couldn't have discovered it sooner. It's one of those two facts. But you haven't got either. You didn't present this to a prior effect, right? You didn't say, let's present it to a jury. We were entitled to a date much later than the actual statute of limitations because we couldn't have discovered it. No, because the judge had granted it as a compulsory tenant claim. We did ask at the same time. But I'm assuming, for the purpose of my question, that we don't buy that. I'm asking you where are you. You could have said, judge, you know, we love your ruling. We're very happy with it, but we think we should submit to the jury the question of when we should have known just to avoid it. You could have done that. But isn't that how these things get decided? If you're not within the statute of limitations, don't questions like that on the California law go to a jury. So you have to go to a jury and say, look, we should not have known any sooner because they were scoundrels and they concealed it. That's how it's done. You're a California lawyer, aren't you? No, I'm not, Your Honor. I wasn't sure where everybody's from. But, you know, that's the law in California. I think it's the law in pretty much every place else. That didn't happen here, right? So aren't you out of luck unless we buy the compulsory tenant claim? Well, Your Honor, if no reasonable fact finder could find to the contrary, that would be an alternative basis. We can grant summary judgment on appeal. At the very least, you have to ask for summary judgment from district court. You didn't do that. Well, but you do have the findings of the district court in the Latches opinion. Different standard. Different standard. Doesn't help you. So I want to sort of play this through. Suppose we don't buy that it's a compulsory counterclaim. Does it go back to Judge Carter or do you still have, you know, would you be filing a new lawsuit where that question of fact might come up? You know, when did you know? Because that would be a defense that was asserted. Well, I mean, I guess in that situation, I guess in the first instance. We still have time, right? It's three years, right? Yes. I guess in the first instance, it would go back to Judge Carter in that circumstance to consider what was appropriate to consider if perhaps there is a. . . So we would reverse him. But it doesn't mean that that claim would survive. It seems to me he would have to file a new lawsuit. And it seems to me that because who tells an arguing that it's not compulsory here, they couldn't argue that it was res judicata. In this lawsuit, it was res judicata against that claim. So I don't know. If I were you, I might be filing that claim tomorrow. Well, and then fighting on the issue of when you had reason at all. More litigation. I know. How fun. Well, you know, I would submit that we think you don't need to reach that because it's a compulsory counterclaim. And as I said. . . That's the problem. You're obviously. . . I mean, it's obviously the closest question is the question both of you are focused on. It's the biggest. . . And, you know, it has involved the most money. So. . . And it's a close question. Yeah. Well, even if it's a close question, I think a fair reading of the pleadings suggests that there is a logical relationship in the same aggregate set of operative facts. And also, judicial efficiency and fairness is part of the settled standard for interpreting Rule 13. That's in this Court's opinion. That's in Plotero. It's in others. And if I could say a word about both judicial economy and fairness. On judicial economy, Judge Carter. . . Which is part of the standard. And Judge Carter emphasized that it would add to the already tremendous burden on judicial resources that this litigation was presenting. And we were already more than six years into the litigation with more than 8,000 docket entries. It was scorched earth litigation. And he correctly viewed it that it would be extremely wasteful and duplicative to have separate litigation that would. . . He said that, but I don't get it. I mean, if you don't have. . . If you're out of luck. . . If you're. . . If such a mutation is brought as a claim, the most judicially efficient thing is not to have it filed. Well. . . Judge Carter said that in the wake of having the evidence that the Mattel executives had been lying in their depositions. And so I would not assume it's untimely. And I don't think that would have been Judge Carter's assumption at the time. And you would have had. . . But that's not his decision to make. If you are going under the discovery rule, that's a jury question. The most he can do is grant one-sided, generalized judgment on it, but. . . But we're talking about the judicial efficiency, which is part of the standard. And in terms of fairness. . . And Ms. Sullivan talked about raised judicata. And she was saying, oh, it would be ridiculous to think that there would have been some raised judicata claim. At the time, Judge Carter decided this. In August 2010, if one assumes that Mattel would prevail, that these particular documents were its trade secrets. And then NGA were to try to file a suit and claim, no, those were actually our trade secrets. I guarantee you Mattel would have been there vigorously arguing that it was barred by raised judicata. And let me come back to the standard of review. Now, I think it's clear under a de novo standard that it's compulsory. But if the court has doubts about that, I do think it's important that the court has precedent that abuse of discretion is the appropriate standard. And this was certainly within Judge Carter's discretion. And let me mention, in addition to the case that we cited, monocyte, where this court has applied abuse of discretion when the claims were to be tried in the same trial, there's another case which is cited in the brief, which is Davidson-Cox v. Suma. And it's 751 F. 2nd of 1525. The court said the district court properly exercised its discretion in dismissing these counterclaims. And the question was whether they were compulsory. So that's also a precedent in the same trial context for abuse of discretion. And I think that makes sense in light of the fact  that that's incorporated in the standard. Do you want to speak on the trademark damages issue? Yes. Thank you, Your Honor. So on the trade secrets damages issue, there are at least three possible bases for the jury verdict in the record. And, of course, Mattel has a particular... You have to articulate a plausible basis in the record under First Alliance. So what is it? Okay. So the three would be the expert's bottom-up theory, the expert's top-down theory. I don't see how top-down works because he predicated that on all 114 claims. Actually, Your Honor, he didn't. There was testimony at the trial where he explicitly was asked about could there be a recovery if there was less than all the trade secrets. Right, and then he divides the bottom-up theory. Pardon? Yes, and that's what he said, his bottom-up theory. No, but he also referred to the 149 or the 202 at the same time, and those are the top-down references. So in terms of the top-down theory, and as Judge Carter explained, that supplies a possible basis. One thing I do want to address, Ms. Sullivan was saying that somehow we had disavowed Alliance on the top-down theory, and I just want to briefly make three points about that, which is, first of all, they quote a snippet of a pleading below out of context, and elsewhere in the pleading we rely on the top-down. We have a whole section that's inappropriate to speculate on the basis for the jury's damages. Secondly, after that pleading, Judge Carter specifically relied on the top-down theory as a possible basis. It's at page 62 of the exercise of record. And so he clearly didn't think we had disavowed it. And third, they raised it for the first time in their reply brief. They talked about top-down in their opening brief. They didn't say anything about waiver on our part. You can waive a waiver argument. That's what they did. And the top-down theory would have supplied either $149 million or $202 million, so the 88.5 remitted to 85 was well within that basis. With regard to the bottom-up theory of the expert, the expert testified about 26 secrets as to 22 of them. The average was $3.4 million. He gave specific damages amounts for the others, and then he extrapolated for the other four. And Mattel says, well, because the jury's list was different from the expert's list, that's an inadequate basis. But 15 of the 25 trade secrets were the same, and there's no principle that the jury has to rely on the exact meets and bounds of the expert's testimony. So the bottom-up theory also supplies the basis. And third, non-expert testimony. There was financial information in the record. He cited that in the brief. Detailed financial records as to each of the different products in the trade secrets, and the jury could have evaluated that. He's heard a lot of testimony about the value of the trade secrets. In conclusion, Your Honor, we ask this Court to affirm the judgment of the district court. Thank you. Thank you. We're out of time. We'll give you a couple of minutes for rebuttal. Thank you, Your Honor. Just very quickly on some points that have been raised. You asked MGA counsel, my good friend Mr. Sloan, to tell you where in the pleadings are there a pleading that Mattel stole from MGA and a pleading that MGA stole the same secrets from Mattel and he gave you none. If he gave you page 1130, that was about Mattel's secrets going to MGA. It wasn't about MGA's secrets going to Mattel. And I invite you to compare. He said, well, we pleaded so much. You can look at our complaints at 1353 to 1365 of the excerpts of record and you will find not one word about toy fairs. You'll find a lot of words about stealing Mattel's trade secrets and taking them off to Mexico. You will not find one word about toy fairs. Now, if you don't believe me that MGA cannot find any overlap between the two sets of pleading, I invite you to look at their brief, the red brief, at footnote 9. It's an amazing footnote. Footnote 9 refers... It's an amazing footnote. Hold on. Now, Mr. Sloan and his able colleague had many months to tell you where in the pleadings is there a factual overlap and they came up with page 26, footnote 9. That's all they came up with. And this is about whether there was any proof of any overlap. Footnote 9 says, even if it's proper to look beyond the pleadings... You asked before was there any proof. MGA's and Mattel's misappropriation claims involved common issues of fact. Compare Mattel's claim that MGA stole the name from Moxie Doll with MGA's using evidence about Moxie to argue that generically it protects its toy fair showroom. And what they don't tell you is Moxie is not among the 114 toy fair claims. She couldn't be. She came out in 2008 after the toy fairs. So there's no overlap. Footnote 9 is the best they can do. Race, IPSA, love, which are on the proof. But don't take it from me in footnote 9. Judge Carter got there too. He said not only did they not plead it, he didn't say they didn't plead it, he said they pleaded it. That was wrong. But after discovery, if I could just refer you, you've been very patient about all these sites. If you look at ER 226, this is Judge Carter's ruling on summary judgment. And now we come back and we say, well, Judge Carter, you thought maybe they could prove some factual, same set of aggregate facts. Maybe you would find that somehow Machado and Brower stole secrets that Mattel had stolen from MGA. And where did he get to on that page? He says, I read from ER 226, Mattel now claims that discovery has revealed that none of the documents and information misappropriated by Brower and Machado overlapped with the memoranda prepared by the market intelligence group. He said discovery revealed nothing. And what did Judge Carter say? He said that was something to deal with at the pleading stage. He doesn't say, oh, I've looked at the discovery and there's a there there. He said the determination of whether a counterclaim is compulsory is made at the time of pleading. We agree. And the pleading had no same facts. Chief Judge Kavinsky, you're absolutely right. More is about claims. It's not about whether there might be some document somewhere in a Mattel computer that might somewhere have had some Toy Fair secrets. It's about claims. The facts have to be, you have to assert the same set of facts supporting your claim. There's no between Toy Fair. That's only on the question of pleading approved. It was neither pleaded nor approved. I think we have it. Your Honor, thank you. Okay. As to, may I say one word about damages and I'll release, just one minute? Okay. First Alliance, we think the whole case goes away once you decide with us on statute of limitations. Should you not agree with us, you can under First Alliance also decide the case now because you have a quantitative way to reduce the damages. We would respectfully submit there were only two trade secrets where there was any evidence of damages, frets, diamonds, and Winter Wonderland. You could order the damages remitted to 6.8. We also respectfully suggest that as Mr. Sloan just admitted, there's only 14. He said 15. Two are the same. It's really 14. There were only 14 trade secrets that were in the expert's chart. You could order under First Alliance. You've got a quantitative basis to do it to the dollar. You could order remitted the claims down to 14 times 3.4, which is 47.6. Or in our view, the maximum supported by the evidence, which is go to 3.4 where anything where the expert was higher and go to his numbers, which are as low as 20,000 for anything that's lower. That gets you to 37.6. You could end the eight years of litigation by ruling for us on statute of limitations or ordering a lowering of damages to 0, 6.8, 37.6, or 47.6 under First Alliance. We respectfully request that you also remand for determination of attorney's fees. You can't redact all of them. You could also go on a summer vacation. I'm sorry? You could also go outside of the corridor on a summer vacation. And that would certainly… That would be more astonishing than footnote nine. Difficult standard, right? Okay, the case is arguably submitted.
judges: Kozinski, Trott, Wardlaw